**Geoffrey SEEKINS, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 2166cv.**

Court of Appeals of Texas, Corpus Christi.

Nov. 19, 1981.

Armando L. Reyna, Corpus Christi, for appellant.

Mike Westergren, County Atty., Corpus Christi, for appellee.

Before BISSETT, YOUNG and GONZALEZ, JJ.

## OPINION

GONZALEZ, Justice.

This is an appeal from an order of the trial court after a jury trial ordering that Geoffrey Seekins be confined to a mental hospital for a period not exceeding 90 days, pursuant to the provisions of Tex.Rev.Civ. Stat.Ann. art. 5547–38 (Vernon 1975).

Appellant contends on appeal that the evidence is insufficient to support jury findings that he requires observation and treatment in a mental hospital for his own welfare and protection and/or for the protection of others. In particular, appellant complains that the State failed to prove that he was a danger to himself and/or to others. We affirm.

The application for appellant's commitment was made by his mother. In addition to the testimony of appellant's mother, the State presented the testimony of a court-appointed psychiatrist and two lay witnesses. After the State rested, appellant testified in his own behalf.

The testimony revealed that appellant claimed to be King James David Hapsburg of Israel and, at other times, claimed to be the Holy Spirit. Appellant also claimed to be the lead singer and guitar player of several well-known rock groups. The evidence further showed that appellant had a history of alcohol and drug abuse, that he served some time in the federal penitentiary for the offense of robbery and that he was also shot in the head by a police officer which left him partially paralyzed. Appellant also is an insomniac who stays gone from his home for days at a time. He often wears a medallion which he kisses frequently and talks to himself a great deal.

A supervisor of a convenience store testified that appellant would often go to his store and related several instances of abnormal behavior. Approximately 30 days before the date of the hearing, appellant was observed jumping up and down, making obscene gestures and directing profanity at passers-by while at a bus stop in front of the convenience store.

On other occasions, appellant went to the same store and stood around looking at the customers and, on three different occasions, bumped or "goosed" female customers. When he was asked to leave the store, appellant claimed to be the owner of the store and told the supervisor he was fired. Two days later appellant returned to the store, shouted some obscenities at the store manager, and again claimed to be the owner of the store.

On another occasion at the same store, appellant stood by the counter with clenched fists, mumbling obscenities at the customers.

Appellant's mother testified that appellant claimed to have killed Lucifer the Dev-

il, and claimed that he had his bones stored at the "armory" at his house, and that he claimed that she was not his mother and threatened to kill her on 10 or 12 occasions within 60 days from the hearing. Approximately two weeks before the hearing, appellant swung a guitar at her head. He also accused her of trying to kill him on several occasions and of having killed his daughters.

The psychiatrist testified that he saw appellant 10 or 11 times, each session lasting from 15 to 30 minutes. The majority of the time appellant was hostile toward the psychiatrist. On one occasion, appellant claimed that the psychiatrist had stolen his ring, and again claimed to be King David of Israel, and, on another occasion, claimed to be the Chief of Psychiatry at the hospital. Appellant also told the psychiatrist that the Communists were trying to kill him.

The psychiatrist concluded that appellant was mentally ill, suffering from schizophrenia-paranoia. The psychiatrist gave a detailed explanation as to the reasons for his conclusion. The psychiatrist testified that there was a real and imminent danger that appellant would cause substantial physical harm to himself and/or others, and he therefore recommended a commitment to the mental hospital.

■ Temporary involuntary hospitalization for mental illness is governed by the Texas Mental Health Code, Tex.Rev.Civ. Stat.Ann. art. 5547–36 (Vernon 1977), et seq. The statute provides that an application for temporary hospitalization must charge, and the trier of fact must find, that the proposed patient is mentally ill and that his own welfare and protection, or the protection of others, requires commitment to the mental hospital. *State v. Lodge*, 608 S.W.2d 910 (Tex.1980); *Harris v. State*, 615 S.W.2d 330 (Tex.Civ.App.—Ft. Worth 1981, writ ref'd n. r. e.). Furthermore, a mentally ill person cannot be deprived of his liberty without a strong showing of a substantial threat of future harm founded on actual dangerous behavior manifested by some overt act or threat in the recent past. *Moss v. State*, 539 S.W.2d 936, 947–50 (Tex.Civ.

App.—Dallas 1976, no writ); *Lodge v. State*, 597 S.W.2d 773, 778–779 (Tex.Civ. App.—San Antonio 1980), aff'd 608 S.W.2d 910 (Tex.1980).

■ Appellant's behavior of making obscene gestures and directing profanity at passers-by, the shouting of obscenities with clenched fists to customers at the store, and the bumping or "goosing" of female customers certainly is provocative conduct which could result in physical danger to appellant from one to whom such conduct was directed. Also, appellant's obsession with death and violence, coupled with the threats and attempt to hit his mother with the guitar, is sufficient evidence to show that he is a danger to others, either of which by itself would be sufficient to support the verdict.

We have reviewed all points of error and they are overruled.

The judgment of the trial court is affirmed.